(No. 49012.-■■■■■■■■■■)

PAUL W. HOFFMANN *et al.*, Appellees, v. JAMES H. CLARK, County Treasurer, *et al.*, Appellants.

*Opinion filed December 12, 1977.*

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Robert D. McLaren and Malcolm Smith, Assistant State's Attorneys, of counsel), for appellants James H. Clark *et al.*

William J. Scott, Attorney General, of Springfield, *pro se* (George W. Lindberg, First Assistant Attorney General, and Paul J. Bargiel, Bonny Sutker Barezky, and Patricia Rosen, Assistant Attorneys General, of Chicago, of counsel), for appellant.

Donovan, Atten, Mountcastle, Roberts & Da Rosa, of Wheaton (Joseph A. Donovan, Keith E. Roberts, and Lloyd E. Dyer, Jr., of counsel), for appellees.

Rathje, Woodward, Dyer & Burt, of Wheaton (James M. Huck, Jr., and Gary L. Taylor, of counsel), for *amicus curiae* Illinois Agricultural Association.

MR. JUSTICE RYAN delivered the opinion of the court:

Plaintiffs, Paul W. Hoffmann and other owners of real property in Du Page County, filed an amended complaint for declaratory judgment and injunctive relief in the circuit court of Du Page County against certain county and State officials in which they alleged the unconstitutionality of sections 20a–1 through 20a–3 of the Revenue Act of 1939 (Ill. Rev. Stat. 1973, ch. 120, pars. 501a–1 through 501a–3). In brief, those sections provide that upon application of the owner, and subject to certain conditions specified therein, real estate used for farming or agricultural purposes which has been so used for the three preceding years shall be valued for purposes of taxation on

the basis of its use for farming or agriculture rather than its fair cash value, which is the basis upon which real estate is normally assessed under section 20 (Ill. Rev. Stat. 1973, ch. 120, par. 501). When such use changes, the person liable for taxes on that real estate must pay the difference between the taxes actually paid in each of the three preceding years and the amount which the taxes for each of those years would have been had the real estate been assessed at its fair cash value, together with five percent interest on such difference. The trial court held each of the sections in question to be unconstitutional, and defendants have appealed directly to this court pursuant to Supreme Court Rule 302(a)(1) (58 Ill. 2d R. 302(a)(1)).

Plaintiffs' suit involved the application of sections 20a—1 through 20a—3 to various parcels of real estate in Du Page County for the years 1972, 1973 and 1974. The three sections in question were added in 1971 and provide as follows:

> "Sec. 20a—1. In all counties with a population of more than 200,000, in addition to valuation pursuant to Section 20, upon the filing of an application under Section 20a—2 by the person liable for the taxes on that real property, real property which is used for farming or agricultural purposes and has been so used for the 3 years immediately preceding the year when the assessment is made shall be valued on the basis of its fair cash value, estimated at the price it would bring at a fair, voluntary sale for use by the buyer for farming or agricultural purposes, but at a level not higher than that permitted by Section 4 of Article IX of the Constitution of the State of Illinois.
> ***
> Sec. 20a—2. The person liable for taxes on real property used for farming or agricultural purposes must file a verified application requesting the additional valuation provided for in Section 20a—1, with the county assessor of the county where the real property is located, by January 1 of each year for which that valuation is desired. *** If the application shows the applicant is

entitled to the valuation under Section 20a—1, the county assessor shall approve it; otherwise, he shall reject the application.

When such an application has been filed with and approved by the assessor, the assessor shall determine the valuation of the real property described in the application on the basis of each of Sections 20 [fair cash value] and 20a—1 [fair cash value for farming] and shall list those valuations separately. ***

When the real property described in any application filed under this Section is no longer used for farming or agricultural purposes, the person liable for taxes on that real property must notify the county assessor, in writing, of that fact.

Sec. 20a—3. The valuation determined under Section 20a—1 shall be used for each year for which application is made and approved under Section 20a—2 and in which the real property is used for farming or agricultural purposes. When the real property is no longer used for such purposes, the person liable for taxes on that real property shall pay to the county treasurer, by the following September 1, the difference between the taxes paid in each of the 3 preceding years as based on a valuation under Section 20a—1 and what those taxes for each of those years would have been when based on the valuation under Section 20, determined in compliance with Section 4 of Article IX of the Constitution of the State of Illinois, together with 5% interest. If this difference is not paid by the following September 1, the amount of that difference shall be considered as delinquent taxes for the purposes of this Act." Ill. Rev. Stat. 1973, ch. 120, pars. 501a—1, 501a—2, 501a—3.

In 1973 section 20a—1 was amended, effective October 1, 1973, to apply to all counties rather than only those with populations of more than 200,000.

Plaintiffs' "Amended Complaint for Declaratory Judgment and Tax Injunction Relief" contained seven counts pertaining to various parcels of real estate which had been assessed at their value for farming purposes for 1972 and 1973 pursuant to approved applications by the respective

owners. It was alleged that, in 1974, tax bills had been received indicating that additional taxes and interest thereon were due for 1972 and 1973 in accordance with the so-called "rollback" provisions of section 20a—3 as a consequence of alleged changes of use from agricultural or farming purposes. Plaintiffs prayed that sections 20a—1 through 20a—3 be held unconstitutional and void in that they violated the equal protection and due process clauses of the State and Federal constitutions and furthermore constituted a legislative classification of real estate for purposes of taxation in violation of section 4(b) of article IX of the Illinois Constitution of 1970. The trial court found the statute to be unconstitutional and ordered:

> "1. That Chapter 120, Sections 501—a—1 through Sections 501—a—3 inclusive, Ill. Rev. Stat. 1973 are ineffective, unconstitutional, void, and without force of law and that taxes assessed against the real property of the plaintiffs herein pursuant to said provisions are void and without force of law.
>
> 2. That the defendants herein and their successors are permanently restrained and enjoined from exercising any powers, rights, or duties respecting the enforcement of such provisions against the plaintiffs herein.
> ***"

The trial court did not specify the grounds on which it held the statute unconstitutional. Subsequent to the filing of defendants' notice of appeal, plaintiffs filed a petition in the circuit court requesting the court to clarify its prior judgment order so as to hold only the rollback provisions invalid. The trial court then entered what was apparently intended as a clarifying order, stating that its prior order "in no way bars the filing and processing of agricultural tax applications by the owners of real estate in Du Page County, Illinois pursuant to the provisions of Ill. Rev. Stat. C. 120, secs. 501—a—1 through 501—a—3." This supplemental order, entered subsequent to the filing of notice of appeal, was of no effect. *City of Chicago v. Myers* (1967),

37 Ill. 2d 470.

Defendants argue that there was no jurisdiction in equity to contest the constitutionality of the statute, since the criteria for such actions as set forth in *Illinois Bell Telephone Co. v. Allphin* (1975), 60 Ill. 2d 350, and *Clarendon Associates v. Korzen* (1973), 56 Ill. 2d 101, were not met. They contend further that under the doctrines of waiver and estoppel plaintiffs should be barred from challenging the validity of a statute under which they voluntarily applied for and received benefits. With respect to the first contention, both *Illinois Bell* and *Clarendon* recognize that taxpayers may seek relief in equity where an act imposing a tax is attacked as unconstitutional in its entirety. Here, the gist of plaintiffs' suit is that the statute pursuant to which their real estate was taxed is unconstitutional and void, and we accordingly conclude that equity jurisdiction lies. *Cf. La Salle National Bank v. County of Cook* (1974), 57 Ill. 2d 318.

The questions of waiver and estoppel are less easily resolved. It is apparent that plaintiffs have voluntarily elected to receive the benefits of the lower valuation for tax purposes on the basis of use of the property for farming or agriculture and are now attempting to avoid the burdens of the rollback provisions of that same statute. Defendants have cited several decisions of this court which applied the general rule that a person who voluntarily accepts the benefits of a statute will thereafter be precluded from challenging its validity unless questions of public policy or public morals are involved. (*Edward P. Allison Co. v. Village of Dolton* (1962), 24 Ill. 2d 233, 236; *Cochennet v. Ambrose* (1961), 21 Ill. 2d 520; *Layton v. Layton* (1954), 4 Ill. 2d 241; *Chicago & Eastern Illinois Ry. Co. v. Miller* (1923), 309 Ill. 257.) In *Arnett v. Kennedy* (1974), 416 U.S. 134, 152-53, 40 L. Ed. 2d 15, 32, 94 S. Ct. 1633, 1643, the United States Supreme Court cited various of its decisions in which it had "viewed

skeptically the action of a litigant in challenging the constitutionality of portions of a statute under which it has simultaneously claimed benefits." We view plaintiffs' action in the same manner. However, application of the doctrines of waiver and estoppel in this case would preclude the determination of important questions of first impression affecting taxpayers and taxing bodies throughout the State. Under the particular circumstances of this case, we conclude that the trial court did not err in denying defendants' motions to dismiss the complaint on the grounds of waiver and estoppel.

The threshold constitutional question is whether sections 20a—1 through 20a—3 of the Revenue Act constitute an invalid classification of real property for purposes of taxation in violation of sections 4(a) and 4(b) of article IX of the 1970 Illinois Constitution. Those sections provide as follows:

"Section 4. REAL PROPERTY TAXATION

(a) Except as otherwise provided in this Section, taxes upon real property shall be levied uniformly by valuation ascertained as the General Assembly shall provide by law.

(b) Subject to such limitations as the General Assembly may hereafter prescribe by law, counties with a population of more than 200,000 may classify or to continue to classify real property for purposes of taxation. Any such classification shall be reasonable and assessments shall be uniform within each class. ***"

Defendants rely upon section 1 of article IX of the Constitution, which provides:

"The General Assembly has the exclusive power to raise revenue by law except as limited or otherwise provided in this Constitution. The power of taxation shall not be surrendered, suspended, or contracted away."

They argue that this provision affirms the sovereign power of the State in the area of taxation except as specifically limited by the Constitution; that nothing in section 4 of

article IX prohibits the General Assembly from classifying real property for purposes of taxation; that section 4(b) merely contains a grant of authority to counties with a population of more than 200,000 to classify real property but does not divest the legislature of authority to do the same; and that, in any event, sections 20a—1 through 20a—3 constitute a valid exercise of the General Assembly's power to prescribe limitations upon the authority of counties to classify real property. Plaintiffs argue that we are not concerned here with the question of the general power to tax which is vested exclusively in the legislature pursuant to section 1 of article IX, but are instead dealing with the specific question of the method by which real property may be assessed for taxation; that such method is expressly limited by sections 4(a) and 4(b); that section 4(a) sets forth the general requirement of uniformity in real property taxation; that section 4(b) constitutes an exception to that rule by granting a limited right to classify to counties with populations of more than 200,000; and that while such right to classify is subject to limitation by the General Assembly, the General Assembly itself may not enact legislation imposing mandatory classification of real estate throughout the State.

The debate concerning section 4 of article IX in the constitutional convention was lengthy, and the proposals concerning that section were controversial. The original proposal of the committee on Revenue and Finance concerning real property taxation was section 4.1 of the committee's proposal and provided:

"Any county over 200,000 population is authorized to classify real property for taxation purposes. The General Assembly shall establish a system of classification of real property for taxation purposes, which system may be adopted by any other county in lieu of uniform taxation of real property. In any county the level of assessment or rate of taxation of the highest class shall not be more than two and one-half times the level of

assessment or rate of tax of the lowest class." 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2108, hereafter referred to as Proceedings.

This proposal thus authorized counties with 200,000 population to classify real property for taxation purposes and permitted the remaining counties of the State to adopt a system of classification which the General Assembly would be required to establish.

Some delegates were strongly opposed to any form of classification of real property, while others favored classification in all counties. In any event, it was generally recognized by the committee and by the convention that the constitution which was to be submitted to the voters for ratification would of necessity have to preserve the *de facto* classification of real property that had been established in Cook County if there was to be any hope of ratification. (3 Proceedings 1898.) With the principle of classification established for Cook County, the delegates from some counties adjacent to Cook also desired that their counties be empowered to classify. They felt since these adjacent counties had overlapping taxing districts with Cook County, it was necessary, in order to have equality of taxation in the overlapping taxing districts, that the adjacent counties also be permitted to classify. The committee had arrived at the proposal's population figure of 200,000 as one that would include all of the counties adjacent to Cook and some of the other larger counties in the State which desired to classify real property. The part of the committee proposal giving the option to the remaining counties was designed to establish a uniform classification that could be adopted by counties of under 200,000 population.

During the debate on this proposal, an amendment was offered which would have prohibited all classification of real property for tax purposes. The amendment was defeated. (3 Proceedings 1997-2016.) Following further

inconclusive debate on the original proposal, Chairman Karns of the Committee on Revenue and Finance, in an attempt to find a middle ground, offered a compromise amendment to the proposal. (3 Proceedings 2021-2022.) The Karns compromise struck the first two sentences of the original proposal and substituted the following:

> "Taxes upon real property shall be levied uniformly by valuation which shall be ascertained in such manner as the General Assembly shall prescribe by law—provide by law, provided that, subject to such limitations as the General Assembly may hereafter prescribe by law, counties may classify or continue to classify real property for purposes of taxation. Any such classification shall be reasonable and assessments shall be uniform within each class. Real property used in agriculture shall be assessed at the same level of assessment as single-family residential real property." (3 Proceedings 2021.)

Under this proposed amendment, all counties would have been permitted to classify real property, subject to limitations by the General Assembly. This amendment was adopted. 3 Proceedings 2029.

Immediately, a motion was made to substitute another proposal for section 4.1 which would have prohibited all classification of any kind of real property in counties of under 2 million population. (3 Proceedings 2029.) This motion failed. 3 Proceedings 2032.

The compromise proposal of Chairman Karns which had been adopted was then referred to the Committee on Style, Drafting, and Submission. When the convention considered the report of that committee an amendment was adopted which permitted classification authorized under the Karns compromise only by counties of 200,000 population. (5 Proceedings 3896.) This proposal was finally approved essentially in this form and became article IX, section 4(b), of the Constitution.

Although there were some delegates who opposed all forms of classification, the debate of the convention

demonstrates primarily a concern for the wisdom of authorizing classification by individual counties, and not for classification by the General Assembly. As one delegate expressed it, if counties were to be permitted to classify, "We are very apt to have a hodge-podge of classification ***." (3 Proceedings 2024.) Another delegate opposed the Karns amendment because he felt that, absent action by the General Assembly, each county could design its own scheme of classification. (3 Proceedings 2027.) Also, the Committee on Revenue and Finance, by way of explanation of its original proposal, stated:

> "The Committee feels that it would be undesirable to permit 102 different systems of real estate taxation in the state." (7 Proceedings 2117.)

Also, on the two occasions mentioned above, attempts were made to prohibit classification of real property. These proposals would have prohibited classification by the General Assembly, as well as by counties. In both instances the proposals were defeated.

It is impossible to gather from the debates a clear sense of the convention on the question of whether the General Assembly, under the proposal of the committee or under the Karns amendment, was to be prohibited from classifying real property for taxation.

Chairman Karns, in explaining his proposed amendment, stated:

> "The second sentence provides that counties may classify or continue classification but subject to such limitations as the General Assembly may provide. I suggest that this provision meets the objection voiced today in that the General Assembly retains the right to prescribe or proscribe a classification and also the right to provide the mechanics by which classification may be done.
> ***
> *** The proposal allows Cook County to continue its system of classification, subject to legislative pre-emption and.control. ***." (3 Proceedings 2022.)

Delegate Leahy asked Chairman Karns "Does it, in essence, just continue what we have today, subject to future restriction or expansion or what have you by the General Assembly?" and Chairman Karns responded, "Correct." (3 Proceedings 2023.) Delegate Gertz then asked: "Chairman Karns, what sort of limitation do you encompass within the phrase, 'provided subject to such limitations as the General Assembly may hereafter prescribe by law'?" Mr. Karns answered: "*** This would be a right for the General Assembly to—in whole or in part—pre-empt the subject matter of classification by dealing with it by law as they will—as they might." 3 Proceedings 2023.

In addition to the above comments, which indicate a rather definite authority vested in the General Assembly to "prescribe" and "proscribe" classification by the counties and to preempt the counties' authority in that regard, there are other parts of the debate which indicate a lesser authority vested in the General Assembly, as indicated by the following:

> "MR. HENDREN: I would like to ask Mr. Karns a question. Delegate Karns, in the second sentence, my question is—not being an attorney—could the General Assembly by statute mandate classification in my county?
>
> MR. KARNS: No.
>
> * * *
>
> MRS. LEAHY: Mr. Karns, I am really just trying to understand what this amendment does.
>
> MR. KARNS: Fine.
>
> MRS. LEAHY: Now as I understand it, in your first sentence you decree uniformity but you do not define any standard upon which the uniformity shall be measured. Right? The General Assembly provides that. It can be 55 percent of fair market value or cash value or full fair value or whatever they set up. Right?
>
> MR. KARNS: Right.
>
> MRS. LEAHY: The only time they move into the picture, in terms of classification, is after the county has decided to classify. Right?
>
> MR. KARNS: Wrong. I think they could—I would

assume they could move into the picture of classification at any time, if they chose.

MRS. LEAHY: But you answered Mr. Hendren and said they could not mandate classification.

MR. KARNS: No, that's right.

MRS. LEAHY: Could they decide—

MR. KARNS: That's a different proposition, I submit—mandating it and enacting legislation in that subject.

MRS. LEAHY: Well, I thought one included the other. Let me ask, could the General Assembly pass a statute saying that any county over 200,000 population *must* classify—*must* do it in the following manner?

MR. KARNS: No, they cannot require classification, but they may prescribe guidelines, whether or not any county is classified.

MRS. LEAHY: Okay. Now—so in a sense, though, they really only have effect after the county has decided to classify. Then they can prescribe how.

MR. KARNS: No, no. They could set up standards prior to any classification in any given county.

MRS. LEAHY: Yes, but they would have no effect if no county decided to classify.

MR. KARNS: That's right." 3 Proceedings 2025-26.

Probably, the most definite statement that was made during the debate concerning the power of the State to classify real property occurred during the discussion of proposal No. 8 of the Committee on Style, Drafting, and Submission. This proposal later became section 4(b) of article IX of the Constitution. Delegate Leahy, in discussing a memorandum that had been prepared comparing the revenue article and the local government article asked the chairman of the Committee on Revenue and Finance and the chairman of the Committee on Local Government to state their understanding of the proposal. She specifically asked:

"Does this mean that the state may not classify real property?" (5 Proceedings 3822.)

Chairman Karns made his response and then Delegate

Parkhurst, chairman of the Committee on Local Government, replied:

> "On this one, the question raised by Delegate Leahy about the state's authority to classify, I would say the same answer pertains to the answer I asked of Delegate Scott a moment ago about assessing. If there's no prohibition—if there's no prohibition in the constitution which prohibits the state from classifying—and I see none—it looks to me like the authority to classify is permissive for counties; and, therefore, it does not preclude the state from doing it." 5 Proceedings 3822.

We cannot gather from these debates any clear expression of an intent on the part of the convention to limit or preclude the General Assembly from classifying real property. Although the Karns amendment provided that "taxes upon real property shall be levied uniformly by valuation \*\*\*," it is evident that even the requirement of uniformity was not clearly viewed by the convention as specifically restricting the authority of the General Assembly. In fact, during the debate, *People ex rel. Miller v. Doe,* 24 Ill. 2d 211, and *People ex rel. Toman v. Olympia Fields Country Club,* 374 Ill. 101, were called to the attention of the convention. Delegate Lyons informed the convention that these cases held that the requirement of uniformity of the 1870 Constitution did not preclude the General Assembly from classifying real property. Instead, he stated that the uniformity limitation meant only that taxes must be equal and uniform among the members of the same class. 3 Proceedings 1991-92.

Article IX, section 2, of our constitution provides:

> "In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly."

This section, by implication, grants to the General Assembly the authority to classify subjects or objects of nonproperty taxes.

Also, article IX, section 5(a), states:

"The General Assembly by law may classify personal property for purposes of taxation by valuation ***."

By this section the General Assembly was specifically granted authority to classify personal property.

We do not view the absence of the grant of any authority to classify real property, when considered in light of the grants in sections 2 and 5, as indicating a clear or specific limitation on the General Assembly's authority to classify real property. The explanation of the original proposal concerning nonproperty taxes advanced by the Committee on Revenue and Finance stated that this proposal "affirms the General Assembly's power to classify ***." (7 Proceedings 2071.) In submitting to the convention its version of the revenue article that had been referred to it for drafting, the Committee on Style, Drafting, and Submission, in explaining the nonproperty tax section, stated:

"The reason for spelling out the 'power' to classify is to support the imposition upon classification laws of a limitation of reasonableness and a requirement of uniformity within classes. A court might find, for example, that the explicit requirements of reasonableness and uniformity impose a stricter standard than is required by the Due Process and Equal Protection Clauses ***. Accordingly, the Section has been turned into a statement of limitation only." (7 Proceedings 2248.)

In this committee's explanation for the language of section 5 of article IX (personal property taxes), it stated:

"In the light of the structure of this Article as discussed in the Explanation of Section 1, it can be argued that Sub-section (a) is superfluous. The sentence contains no limitations on the power to tax. Unlike Section 4, there is no opening limitation of uniformity to which exceptions for classification are necessary. Nevertheless, in view of the history of the Revenue Article of the 1870 Constitution, it may be appropriate to empha-

size the power of the legislature to classify, to abolish
taxes on given classes, and authorize personal property
taxes not based on valuation." (7 Proceedings 2252-53.)

It is thus evident that section 2 and section 5 of article IX
were not considered as grants of power to the General
Assembly, but only affirmations of authority which the
legislature possessed and limitations thereon. Although the
explanation of section 5 above quoted may indicate that
the committee felt that the uniformity requirement ·of
section 4 placed certain limitations on the General
Assembly as to the classification of real property, it is not
clear from the debates, which we have above considered in
some detail, that the convention considered the uniformity
requirement as such.

Although classification of real property was a very
controversial subject at the convention, the Committee on
Revenue and Finance recognized that the constitution
which was being written should not prohibit the use of this
means to cope with future problems which may be
brought about by changing conditions. The committee
stated in its report to the convention:

"Finally, the complexity of urban life and the rapid
changes that occur in our society mean that a uniform
property tax may have undesirable economic and social
effects. For example, the property tax may discourage the
maintenance of property. It often encourages the use of
land in ways that are not in the best interests of
society—creating urban sprawl and the development of
urban and rural slums." (7 Proceedings 2114.)

It thus appears that the committee prophetically recog-
nized the problem which the General Assembly attempted
to resolve when it enacted the statute under consideration
in this case. Also, along the same line, the committee
stated further:

"The Committee feels that it would be undesirable to
permit 102 different systems of real estate taxation in the
state. Nevertheless, the Committee does not believe that it

is desirable to prevent any possible future use of classification." 7 Proceedings 2117.

In discussing the nature of the power of the General Assembly under the revenue article, this committee explained that it "vests the power to raise revenue in the General Assembly except to the extent that the constitution grants such power to local governments or otherwise limits the legislature's authority." (7 Proceedings 2062.) And further the committee stated:

"Indeed, the inherent power of government to tax is so well established that it would undoubtedly be held to exist even in the absence of any constitutional provision authorizing it. \*\*\* As a result, any attempt to grant a specific taxing power in a state constitution becomes, in effect, a limitation on the inherent power. The Committee does intend to place limits upon the General Assembly in its exercise of the tax power, but those limits are *expressly* stated and they are *exclusive*. The Committee believes that it is very important to avoid the narrow and often unintended limitations which resulted from court interpretations of the existing constitutional provisions and which might again result if we were to attempt to spell out affirmatively and in detail the state's taxing powers.

The proposed wording achieves this objective by affirming the sovereign power of the state and the General Assembly in Section 1 and then, in later sections, setting forth the specific restrictions which are intended to circumscribe the scope of the taxing power.

Section 1 allows the General Assembly broad latitude in imposing taxes \*\*\*. The Committee did not list these taxes in the proposal, however, because of the danger that a court might interpret any omission as a denial of the power to impose a tax not specifically named in the constitution. \*\*\* The Committee's approach, in not listing taxes which the legislature may impose, recognizes that during the life of this constitution forms of taxation, or variations of existing forms, may be developed which the state should be free to adopt if its elected representatives so choose.

The Committee believes that the General Assembly

> presently has the power to levy all kinds of taxes. \*\*\*
> This proposal eliminates any doubt on that score. It
> permits the General Assembly to concentrate on the
> merits of tax policy rather than upon the constitu-
> tionality of a particular form of taxation and it *places the
> formulation of tax policy in the legislature, where it
> belongs, rather than in the courts.* " (Emphasis added.) 7
> Proceedings 2066-67.

From these explanations there can be no doubt that it
was intended that the power to raise revenue through
taxation is firmly vested in the General Assembly both
through the inherent power of that body, and by the
specific grant of the Constitution. It is further clear that it
was the intent of the committee that this power be subject
to only such limitations as are *expressly* stated in the
Constitution and that the express limitations are to be
*exclusive.* It was further clearly a concern of the commit-
tee that through court construction "narrow" and "unin-
tended" limits might be placed upon the General Assem-
bly's power.

Absent an express and specific constitutional limita-
tion upon the General Assembly's power to classify real
property, which we do not find, we must conclude that
that body possesses the power to classify. The presence of
the uniformity requirement in section 4(a) of article IX
cannot be said to constitute an express limitation. There is
no clear indication that the constitutional convention
viewed it as such. Also, as noted earlier, the convention
was informed of the construction of the 1870 Constitu-
tion's command of uniformity which required only that
taxation must be uniform as to the class upon which it
operated *(People ex rel. Miller v. Doe; People v. South-
western Bell Telephone Co.,* 377 Ill. 303; *People ex rel.
Toman v. Olympia Fields Country Club).*

Without a doubt we could lift from the various
segments of the constitutional debates statements by
delegates which reflect that a particular delegate may have

interpreted certain language of the proposed constitution as restricting the General Assembly's power to classify. The fact remains that no such express restriction was incorporated in that document and, as noted above, at least two attempts were made to substitute proposals that would have specifically prohibited the General Assembly from classifying real property, and both of those proposals were defeated. We are not, therefore, through judicial interpretation, disposed to fulfill the fears expressed in the report of the Committee on Revenue and Finance by placing upon the constitutional provision here under consideration a "narrow" or "unintended" limitation upon the General Assembly. We are at this period of time early in the life of this constitution. We should not now through narrow construction make it difficult or impossible for the legislative body at some future time to resolve revenue problems which are not now known or foreseeable. We acknowledge that classification of real property was severely criticized by some during the convention and that the convention had before it reports from other States where classification had been practiced, which warned of its abuse. We cannot read into the Constitution a limitation which it does not contain solely to prevent some possible future abuse. Whether the principle of classification may at some time in the future be unwisely applied is not of judicial concern. The formation of tax policy, although it may be foolish and unwise, as long as it remains within constitutional limits, is peculiarly within the province of the elected representatives of the People.

Plaintiffs also contend that the rollback provision of section 20a—3 constitutes an invalid classification under our constitution. What has been said concerning the authority of the General Assembly under section 4(b) of article IX to classify real property for assessment purposes also applies to its authority to classify real property for the application of the rollback provision of the statute.

Plaintiffs argue that the rollback provision constitutes a denial of equal protection. Their argument is that the General Assembly has be virtue of sections 20a—1 through 20a—3 classified real property used for agricultural purposes and any assessment in this class must be uniform. They contend that uniformity is violated when property previously used for agricultural purposes is subjected to a rollback of taxes for 3 years. Such property, they argued, has effectively been taxed at a higher rate than other property in its class for that 3-year period.

We do not agree with plaintiff's contention. All real property that no longer qualifies for the special treatment given to farmland under sections 20a—1 through 20a—3 constitutes a separate and distinct class and all parcels within that class are treated uniformly. This court has held that the legislature has a wide discretion in classifying objects of its legislation and the exercise of that discretion will not be interfered with judicially unless clearly in violation of some constitutional limitation. There is a presumption favoring the validity of the classification, and the one assailing it has the burden of showing that the classification is arbitrary. (*Heyman v. Mahin,* 49 Ill. 2d 284; *Jacobs v. City of Chicago,* 53 Ill. 2d 421.) The reasons justifying the classification need not appear on the face of the statute, and the classification must be upheld if any state of facts can reasonably be conceived that would sustain it. (*Thorpe v. Mahin,* 43 Ill. 2d 36.) The equal protection question therefore is whether there exists a rational basis for the rollback provision. *Spaulding v. Illinois Community College Board,* 64 Ill. 2d 449.

The tax bills attached to the pleadings demonstrate that if the farmland involved in this case were assessed at the market value under section 20 and not its market value as agricultural land under section 20a—1, the taxes would far exceed the value of the agricultural products that could be produced on the land. There can be no serious question

that these facts support the special consideration given to assessment of agricultural land by the statute. An allied problem concerns the fast disappearance of agricultural land and open space, especially near urban areas. The preservation of farmland and open space has been considered a serious problem warranting legislative action by more than half of the States. The problem and the various legislative efforts to resolve it have received widespread attention in the periodicals. (See *Preferential Property Tax Treatment of Farmland and Open Space Under Michigan Law*, 8 U. Mich. J.L. Ref. 428 (1975); *Property Taxation of Agricultural and Open Space Land*, 8 Harv. J. Legis. 158 (1970); *Taxation of Agricultural Property—When Is A Farm Not A Farm?*, 26 U. Miami L. Rev. 260 (1971); Carman & Polson, *Tax Shifts Occurring As A Result Of Differential Assessment Of Farm Land: California, 1968-69*, 24 Nat'l Tax J. 449 (1971); Cooke & Power, *Preferential Assessment of Agricultural Land*, 47 Fla. B.J. 636 (1973); Ellingson, *Differential Assessment and Local Governmental Controls To Preserve Agricultural Lands*, 20 S.D. L. Rev. 548 (1975); Adamson, *Preferential Land Assessment In Virginia*, 10 U. Rich. L. Rev. 111; Hagman, *Open Space Planning And Property Taxation—Some Suggestions*, 1964 Wis. L. Rev. 628; Peterson & McCarthy, *Farmland Preservation By Purchase Of Development Rights: The Long Island Experiment*, 26 DePaul L. Rev. 447 (1977).) Many legislative efforts to preserve agricultural land and open space, in addition to extending preferential tax treatment to land used for agricultural purposes, have attempted to discourage the discontinuance of that use through rollback provisions similar to the one challenged by plaintiffs. See *Property Taxation of Agricultural and Open Space Land*, 8 Harv. J. Legis. 158, 161.

The general recognition of the need for some special effort for the preservation of farmland and open space demonstrates that there exists a rational basis for the

creation by the legislature of a class of taxpayers from whom an additional tax is required when the land no longer qualifies for the special treatment given to it under the provisions of section 20a—1.

Plaintiffs further contend that sections 20a—1 through 20a—3 violate the due process clause of the Federal and State constitutions in that the statute is vague and indefinite and that it does not provide for a notice of reassessment. As to the contention that the statute is vague and indefinite, plaintiffs argue that the statute provides real property is eligible for agricultural valuation if it is in excess of 10 acres. Since the Du Page County assessor does not assess on the basis of 10-acre parcels, plaintiff argues that property in excess of 10 acres may be denied farm valuation. Also, they contend that one parcel involved in this case was "apparently denied" agricultural valuation because a portion of the farm was conveyed for non-agricultural use. These situations to which the plaintiffs allude involve no more than possible misapplications of the statute, which do not render the statute invalid. See *Jacobs v. City of Chicago*, 53 Ill. 2d 421, 427.

Concerning plaintiffs' lack-of-notice due-process argument, it is their position that the statute does not provide for notice of reassessment when the rollback provision is applied. We first observe that section 20a—3 does not involve a reassessment. When land qualifies for assessment under 20a—1, then section 20a—2 provides that the assessor shall determine the value of land under both section 20 (fair cash value) and section 20a—1 (fair cash value for farm purposes), and shall list both assessments separately. Also, the county clerk is required to set out the valuation made under each section. The rights of a taxpayer as to notice and hearing with regard to these assessments are set out in detail in sections 99 through 111.5 of the Revenue Act. (Ill. Rev. Stat. 1973, ch. 120, pars. 580 through 592.5.) Following the finalizing of the

dual assessments, taxes are levied on the basis of the reduced assessment until some event triggered by the landowner occurs which causes taxes to be levied on the larger assessment. If a parcel has been wrongfully removed from the status of agricultural lands, then relief can be had by the traditional method of paying taxes under protest and filing objections to the application for judgment. Ill. Rev. Stat. 1973, ch. 120, pars. 675, 716.

Plaintiffs argue that two counts of the amended complaint in this case involve situations in which purchasers of agricultural land changed the use to nonagricultural. It is contended that they had no knowledge that the prior owner had applied for and had been granted agricultural valuation. Upon the change in use, the new owner became subject to not only taxes based on the increased valuation for the current year, but also the difference between the taxes based on the agricultural assessment and taxes based on the larger assessment for 3 preceding years, a period of time when the present owners were not the owners of the property. Plaintiff sees this as a due process violation.

In exchange for the privilege of having the property assessed at the lower value, the State has imposed certain restrictions on the use of such property. The lower assessment encourages the continued use of farmland for agricultural purposes by making it economically feasible to continue such use. This encouragement alone is not enough to accomplish the objective of preserving farmland and open space. It must be complemented by a program which will also discourage diverting agricultural land to other and possibly more profitable uses. This, of course, is the object of the rollback provision. Once the lower assessment has been accepted, then the use of the land has been circumscribed by restrictions similar in nature to those imposed by zoning regulations. However, unlike zoning restrictions, these are restrictions which the owner

has voluntarily imposed upon the use of the land by requesting and accepting the lower assessment. Anyone who purchases agricultural land can learn whether its use has been so restricted and whether the rollback taxes will have to be paid simply by ascertaining whether or not the land has been taxed on an assessment under section 20a–1, instead of on an assessment under section 20. This is no more burdensome than ascertaining whether certain zoning regulations apply to property which is being purchased. We do not consider that the requirement that the rollback taxes be paid when the restriction on the use of the land is removed constitutes a due process violation.

Lastly, the plaintiffs contend that the provisions of section 20a–3 which require a payment of 5% interest on the rollback taxes "constitute a penalty in that the taxpayer has no alternative but to pay interest charged on an amount for which he is not billed until long after the year for which the tax is due," thereby depriving the owner of property without due process of law.

First, the statute plainly states that the 5% payment is "interest" and it is computed on the rollback taxes. It is not a penalty. A penalty is in the nature of punishment for the nonperformance of an act or for the performance of an unlawful act. It involves the idea of punishment. *Woolverton v. Taylor,* 132 Ill. 197, 206.

The same act that extends to the landowner the privilege of having his farmland assessed at a reduced valuation also contains the provision with regard to the payment of the rollback taxes and 5% interest when the property no longer qualifies for the lower assessment. The 5% interest payment is a part of the legislative scheme to discourage the diverting of agricultural land to other uses and partially, at least, reimburses the taxing bodies for the loss of the use of the money to which they are entitled based on the higher assessment. As noted above, the landowners voluntarily placed their land in the lower

valuation classification. They were not required to do so. Neither were they required to remove their land from this classification. When they voluntarily did remove the land from the lower assessed classification, they became subject to the payments provided by statute, including interest. This does not constitute a due process violation. *Spalding v. City of Granite City*, 415 Ill. 274, 278.

Pursuant to the above analysis of sections 20a–1 through 20a–3 of the Revenue Act, we find that these sections do not violate article IX, section 4, of the Constitution of 1970, or the due process or equal protection clauses of that constitution, or the Federal Constitution. The circuit court erred in holding these sections of the statute unconstitutional. Accordingly, the judgment of the circuit court of Du Page County is reversed.

*Judgment reversed.*

MR. JUSTICE UNDERWOOD, dissenting:

As I read the court's opinion it holds, in effect, that because the convention which drafted our 1970 Constitution did not say in article IX "The General Assembly is specifically prohibited from classifying real estate for purposes of taxation," the legislature now possesses that power despite what seems to me an unmistakable manifestation of the convention's contrary intention. Demonstration of that contrary intention will require more than a page or two, but the importance of the issue compels me to attempt it.

The question, of course, is whether sections 20a–1 through 20a–3 of the Revenue Act of 1939 (Ill. Rev. Stat. 1973, ch. 120, pars. 501a–1 through 501a–3) constitute an invalid classification of real estate for purposes of taxation in violation of sections 4(a) and 4(b) of article IX of the 1970 State Constitution. Those sections provide as follows:

"4. REAL PROPERTY TAXATION

(a) Except as otherwise provided in this Section, taxes upon real property shall be levied uniformly by valuation ascertained as the General Assembly shall provide by law.

(b) Subject to such limitations as the General Assembly may hereafter prescribe by law, counties with a population of more than 200,000 may classify or to continue to classify real property for purposes of taxation. Any such classification shall be reasonable and assessments shall be uniform within each class. The level of assessment or rate of tax of the highest class in a county shall not exceed two and one-half times the level of assessment or rate of tax of the lowest class in that county. Real property used in farming in a county shall not be assessed at a higher level of assessment than single family residential real property in that county."

At the outset, it is important to observe the manner in which article IX is structured. Section 1 confers broad powers upon the General Assembly to raise revenue, while sections 2 through 9 contain specific and exclusive limitations on such powers. The following explanation appears in the report of the Committee on Revenue and Finance with reference to section 1, which was adopted in substantially the same form as initially proposed by the committee:

"The Committee does intend to place limits upon the General Assembly in its exercise of the tax power, but those limits are expressly stated and they are exclusive. ***

The proposed wording *** [affirms] the sovereign power of the state and the General Assembly in Section 1 and then, in later sections, [sets] forth the specific restrictions which are intended to circumscribe the scope of the taxing power." 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2066 (hereafter referred to as Proceedings).

Section 4 of article IX expressly restricts the manner in which revenue may be raised by taxation of real property. The opening sentence of section 4(a) sets forth

the general rule that real estate taxes must be levied *uniformly by valuation* except as otherwise provided in section 4. Section 4(b) creates an exception to the general rule of uniformity by authorizing counties with a population of more than 200,000 to classify real property for purposes of taxation subject to limitations prescribed by the General Assembly. Since the exception permitting classification is expressly limited to counties with populations of more than 200,000, it is evident that any law establishing classification in counties with populations of less than 200,000 would not fall within the section 4(b) exception and would clearly violate the general rule of uniformity contained in section 4(a). This is the view expressed by this court in *Hamer v. Kirk* (1976), 65 Ill. 2d 211, 219, where it was said in considering a related question: "The Constitution permits the classification of real property for purposes of taxation only in counties with a population of more than 200,000." The language of section 4(b) also plainly states that classification in counties which may classify is permissive and not mandatory. While the General Assembly may well have broad authority pursuant to section 4(b) to enact laws affecting the manner in which such counties may classify, the power to prescribe "limitations" cannot fairly be construed to include the power to enact laws mandating classification in counties which do not wish to do so.

The explanation accompanying the official text of section 4 of article IX, as it was submitted to and adopted by the voters, clearly recognizes that the general rule of uniformity is applicable to all counties except those with populations of more than 200,000 which "may" classify real estate for taxation purposes. The explanation states:

"This replaces parts of Article IX, Sections 1 and 3 of the 1870 Constitution. Any tax on real property must be uniform and based on the value of the property, except in counties which are permitted to classify real estate for

taxation purposes. Counties with more than 200,000 population may divide real property into reasonable classes with uniform assessments within each class, subject to regulation by the General Assembly. The highest class in a county may not be assessed or taxed at a rate more than two and one-half times that of the lowest class. This section also protects farm property in a county from being assessed at a level higher than that of single-family residential real property." 7 Proceedings 2736-37.

It is highly significant, in my opinion, that section 5 of article IX, which is concerned with personal property taxation, expressly provides that the General Assembly shall have authority to classify personal property. Section 5(a) provides:

"The General Assembly by law may classify personal property for purposes of taxation by valuation, abolish such taxes on any or all classes and authorize the levy of taxes in lieu of the taxation of personal property by valuation."

The Committee on Style, Drafting and Submission offered the following explanation for that language:

"In the light of the structure of this Article as discussed in the Explanation of Section 1, it can be argued that Subsection (a) is superfluous. The sentence contains no limitations on the power to tax. Unlike Section 4, there is no opening limitation of uniformity to which exceptions for classification are necessary. Nevertheless, in view of the history of the Revenue Article of the 1870 Constitution, it may be appropriate to emphasize the power of the legislature to classify, to abolish taxes on given classes, and authorize personal property taxes not based on valuation." (7 Proceedings 2252-53.)

The inclusion of the uniformity requirement in the section dealing with real estate (art. IX, sec. 4) together with the authorization for counties over 200,000 to classify, when considered in the context of the express grant of legislative authority to classify personal property contained in section 5 is, in my judgment, quite persuasive, if not

conclusive, evidence of an intent to restrict the power to classify real estate for taxing purposes to those counties of more than 200,000 population. This is the conclusion of the authors of the commentary on the 1970 Constitution (Ill. Ann. Stat., 1970 Const., art. IX, sec. 4, Constitutional Commentary, at 176 (1971)), who state:

> "Section 4 seems to prohibit the classification by the State and other units of government of real estate for tax purposes, except in counties of 200,000 or more in population (there were 8 such counties under the 1970 census). Within the exception, classification is subject to limitations contained in Subsection 4(b) and to such further limitations as may be prescribed by law. This limited power to classify real estate for tax purposes represented a compromise at the Convention between those who opposed any classification and those who wanted all counties to have the right of classification."

Vesting in the General Assembly authority to place limitations upon the power of the populous counties to classify is entirely consistent with an intention to have a degree of uniformity in the classification systems adopted by those counties having power to do so.

My conclusions are strengthened by examination of the proceedings of the convention, which shows that from the beginning the framers of the present Constitution felt that the *de facto* classification of real estate for purposes of taxation, which had developed in Cook County since the adoption of the 1870 Constitution, was a matter that should be expressly dealt with in the 1970 Constitution. The initial proposal of the Committee on Revenue and Finance provided as follows:

> "Section 4.1—Real Property Taxation
> Any county over 200,000 population is authorized to classify real property for taxation purposes. The General Assembly shall establish a system of classification of real property for taxation purposes, which system may be adopted by any other county in lieu of uniform taxation of real property. In any county the level of assessment or

rate of taxation of the highest class shall not be more than two and one-half times the level of assessment or rate of tax of the lowest class." (7 Proceedings 2108.)

The committee report included these comments and explanation:

"Article IX, Section 1 of the present constitution requires that the property tax be uniform according to value and, except for certain specified exemptions, that it apply to all kinds of real and personal property." 7 Proceedings 2109.

"The provisions permitting counties of more than 200,000 population to classify real estate represent a recognition of the desirability of permitting the de facto system of classification in Cook County to continue and of the stated desire to have it extended to other counties. This system has developed out of the experience of many years. Given the necessity of raising large sums of money from property taxation, it reduces the harmful effects of the tax by placing more of the burden upon those kinds of property which are unique to the central city or which obtain special advantages from a central city location.

The Committee also recognizes the fact that an abrupt shift from the present system to a system of uniformity would create political, administrative and legal chaos.

The decision to permit other populous counties to classify real estate stems from the Committee's recognization [sic] that several of these counties are part of the Chicago Metropolitan Area and that all of them face, or may face, problems similar to those which resulted in the development of the present system in Cook County. The proposal will permit each of these counties to adopt a system similar to that used in Cook County or to develop a system better adapted to its own particular circumstances.

Analysis of the problem and the testimony of those who appeared before the Committee indicates that there is less need and less desire for classification of real estate in the less populous counties. The Committee feels that it would be undesirable to permit 102 different systems of real estate taxation in the state. Nevertheless, the Com-

mittee does not believe that it is desirable to prevent any possible future use of classification. The suggested language requires the General Assembly to develop a system of classification suitable for the less populous counties and to give counties the option of adopting the system or continuing to assess on a uniform basis." (7 Proceedings 2115-17.)

It is important, in my opinion, to note that the convention deleted from this proposal the language which would have authorized the General Assembly to establish a system of classification which any county choosing to do so could adopt. The report also made reference to the fact that other States had adopted comprehensive systems of real estate classification. Exhibits attached to the report showed that in Arizona the rate of assessment ranged from 18% to 60%, in Minnesota from 5% to 50%, and in Montana from 7% to 100%. A number of committee members filed dissenting statements indicating their strong opposition to classification of real property for taxation purposes, citing statements from taxing officials in Minnesota to the effect that the classification system in that State had been a total failure and should not be attempted in other States. (7 Proceedings 2125.) Other committee members objected to any form of classification outside of Cook County. 7 Proceedings 2127.

When the committee's proposal was brought before the convention for its consideration, it became apparent that there was a division between those delegates who favored classification, those who favored it only for Cook County and the surrounding "collar" counties, and those who opposed it for any county. The committee's rationale for the proposal regarding classification is illustrated by the following discussion between Delegates Tomei and Scott:

"MR. TOMEI: Finally, I think I would like to ask just a general philosophical question, and that deals with the rationale for classification of real property. I under-

stand, of course—I can understand the classification when it comes to income, because we know it's a factor of ability to pay—and we may get to that through the exemption route or some other means, if we have the flat rate tax proviso—but I wondered what the rationale is, in the committee's opinion, for this type of classification with respect to real property.

MR. SCOTT: I would have to be 100 percent honest with you; I don't think you can get very many authorities that would defend, on an economical basis, the classification of real estate for taxation purposes. But let's be realists. I know, as I stand here before you, that no revenue article amendment is going to pass that doesn't in some way, maybe with some restrictions, make legal the de facto classification in Cook County." 3 Proceedings 1898.

The following discussion concerning the vesting of power in counties over 200,000 to classify real estate for taxation is also pertinent:

"MR. WHALEN: Mr. Scott, I was wondering what the rationale of the committee was for vesting in the General Assembly the power to classify personal property, but not vesting that power in the General Assembly in counties over 200,000 for realty?

MR. SCOTT: That is a hard one to answer, but the honest answer was that the consensus—or at least that day we voted ten to eight—the ten favored that we leave it to, really, the county boards in those counties. That's about the best answer I can give you.

MR. WHALEN: You favored doing it, but I don't understand the reason for it.

MR. SCOTT: Well, I guess the reason for it, and my reason would be for it—the only reason I could give— would be really that property taxes go—the revenues therefrom go—to the local governments, and it should be a local problem, if this Convention goes that way or goes on record and supports that view; and the best body to determine it at the local level is the county board, and, as you know, now we also have mandatory supervisors of assessments, and that is a county officer who will be working with the county board. ***" (3 Proceedings 1901-02.)

That discussion is indicative, as are others, of the intent that the General Assembly, even as to counties over 200,000, have no power to classify as to real estate.

A proposed amendment to do away with any form of classification by requiring uniform assessment of real property throughout the State was debated and defeated. (3 Proceedings 1997-2016.) Another amendment which would permit classification only in counties of over 2,000,000 was also defeated in the face of opposition by delegates from the collar counties in which there were taxing districts which overlapped with Cook County. 3 Proceedings 2017-20.

In an attempt to reach a compromise between the opposing viewpoints, Delegate Karns, who was chairman of the Committee on Revenue and Finance, proposed the following amendment:

> "Taxes upon real property shall be levied uniformly by valuation which shall be ascertained in such manner as the General Assembly shall prescribe by law—provide by law, provided that, subject to such limitations as the General Assembly may hereafter prescribe by law, counties may classify or continue to classify real property for purposes of taxation. Any such classification shall be reasonable and assessments shall be uniform within each class. Real property used in agriculture shall be assessed at the same level of assessment as single-family residential real property." (3 Proceedings 2021.)

The effect of the proposed amendment was to establish the concept of uniformity of real property taxation as a general rule but to permit all counties to classify at their option subject to limitations prescribed by the General Assembly. This amendment was adopted but then subsequently modified to limit the classification power to the counties over 200,000. Quite significantly, as indicated earlier, the amendment eliminated entirely the original concept that the General Assembly could establish a system of classification which could be adopted by

counties under 200,000 in lieu of uniform taxation.

It is also important, in considering the validity of the statute before us which requires classification at the request of the owner of qualified land, to recognize that while the convention contemplated that the General Assembly would retain the right to enact laws limiting the manner in which the populous counties classify, it was not intended that any county could be required to classify. The following discussion is relevant:

> "MR. HENDREN: I would like to ask Mr. Karns a question. Delegate Karns, in the second sentence, my question is—not being an attorney—could the General Assembly by statute mandate classification in my county?
>
> MR. KARNS: No." 3 Proceedings 2025-26.
>
> "MRS. LEAHY: Mr. Karns, I am really just trying to understand what this amendment does.
>
> MR. KARNS: Fine.
>
> MRS. LEAHY: Now as I understand it, in your first sentence you decree uniformity but you do not define any standard upon which the uniformity shall be measured. Right? The General Assembly provides that. It can be 55 percent of fair market value or cash value or full fair value or whatever they set up. Right?
>
> MR. KARNS: Right.
>
> MRS. LEAHY: The only time they move into the picture, in terms of classification, is after the county has decided to classify. Right?
>
> MR. KARNS: Wrong. I think they could—I would assume they could move into the picture of classification at any time, if they chose.
>
> MRS. LEAHY: But you answered Mr. Hendren and said they could not mandate classification.
>
> MR. KARNS: No, that's right.
>
> MRS. LEAHY: Could they decide—
>
> MR. KARNS: That's a different proposition, I submit—mandating it and enacting legislation in that subject.
>
> MRS. LEAHY: Well, I thought one included the other. Let me ask, could the General Assembly pass a statute saying that any county over 200,000 population

*must* classify—*must* do it in the following manner?

MR. KARNS: No, they cannot require classification, but they may prescribe guidelines, whether or not any county is classified.

MRS. LEAHY: Okay. Now—so in a sense, though, they really only have effect after the county has decided to classify. Then they can prescribe how.

MR. KARNS: No, no. They could set up standards prior to any classification in any given county.

MRS. LEAHY: Yes, but they would have no effect if no county decided to classify.

MR. KARNS: That's right." 3 Proceedings 2026.

"MR. SHUMAN: Mr. Karns, could you tell me, in the absence of any law enacted by the General Assembly, could a county choose to classify, if this provision was a part of our constitution?

MR. KARNS: Yes.

MR. SHUMAN: Could every county choose to classify in the absence of any limitations imposed by the General Assembly?

MR. KARNS: If it chose." (3 Proceedings 2027.)

These questions and answers occurred, of course, prior to the adoption of the 200,000 limitation.

After further discussion, the Karns amendment was adopted and later modified by adding the 200,000 limitation. A discordant note, stressed by defendants and emphasized in the majority opinion, was interjected during a colloquy on a subsequent date between Delegates Karns and Parkhurst:

"MRS. LEAHY: Does this mean that the state may not classify real property? Or did the Revenue Committee take a position on that?

MR. KARNS: Well, we—I think we reserved—an attempt was to reserve to counties the initial ability to classify real, real property. However, you will notice the first sentence of 4(b) says, 'Subject to such limitations as may hereafter be prescribed by law.' That would give the state an opportunity, if—we assume that if the matter got out of hand, or if they wanted to impose some limitations or restrictions or general laws dealing with the matter,

they would have the ability to do so.

MRS. LEAHY: I think, though, the question is directed to 4(a).

MR. PARKHURST: May I comment?

MR. KARNS: Go ahead.

MR. PARKHURST: ***

On this one, the question raised by Delegate Leahy about the state's authority to classify, I would say the same answer pertains to the answer I asked of Delegate Scott a moment ago about assessing. If there's no prohibition—if there's no prohibition in the constitution which prohibits the state from classifying—and I see none—it looks to me like the authority to classify is permissive for counties; and, therefore, it does not preclude the state from doing it." (5 Proceedings 3822.)

In judging the accuracy and relevance of Delegate Parkhurst's statement, however, it should be remembered that he was not a member of the committee, and, apparently, expressed only his own opinion.

The delegates then adopted the amendment proposed by Delegate Hendren which limited classification to counties with over 200,000 inhabitants. (5 Proceedings 3896.) Following that, Delegate Karns proposed an amendment which would delete the last sentence of section 4(b), which read: "Real property used in farming in a county shall not be assessed at a higher level of assessment than single-family residential real property in that county." (5 Proceedings 3907.) The proceedings include the following explanation and discussion which indicate an intent to limit classification to counties with populations of more than 200,000:

"MR. KARNS: I would just say in behalf of this amendment that we just adopted an amendment introduced by Mr. Hendren which I believe makes the last sentence unnecessary in section 4(b). As you will recall, I was the architect of this accommodation some months ago, and the last sentence at that time was a sentence that was desired by the agricultural community. I understand, now, that they would prefer that that sentence not be in

there—that they have some reservation about its presence perhaps rendering some constitutional infirmity in this section—at least, that's the opinion of their counsel. I have not read his opinion, so I am not fully aware of the reasoning—the reasons behind it. However, with the—when we limit the classification to counties over 200,000, I don't think that the last sentence is necessary in any event, so I would ask that that be removed.

\* \* \*

MR. LEWIS: Mr. Vice-President, unless Delegate Karns has information other than what I have, the feeling among the farm community is that since it may—it might—be unconstitutional, that they wanted protection in having no classification downstate with any respect to farm communities. We have taken action that still leaves classification in seven counties. Therefore, the protection is still needed for those seven counties, and it—while it might have some problems constitutionally, they would want it left in; and the protection is still needed in those counties, certainly, in order to make it somewhat uniform with the status downstate where there is no classification, so I would urge us not to strike this sentence. It is my understanding of the experts with respect to the farm community that they still want the possible protection that it affords in those seven counties.

If it is stricken by the courts later, fine; but they want at least to have a go at it on those seven counties. They would have much preferred to have no classification except in Cook County, but since there was a desire to put in some other larger counties, they certainly were willing to go along with the 200,000 limit; but I would ask that we not delete this sentence so that there will be that protection in those seven counties.

VICE-PRESIDENT SMITH: Delegate Mathias?

MR. MATHIAS: Well, Mr. Vice-President, I agree with what Mr. Karns said with respect to the opinion of the counsel for the Illinois Agricultural Association. He was afraid of this section. I have doubts myself, but—and I think that Mr. Karns is entirely right—in the counties of less than 200,000 population there is no need for this sentence.

\* \* \*

MR. LEWIS: Mr. Vice-President, wouldn't I be correct that the effect of the Hendren amendment is to apply section (b) only to counties of 200,000 or over; and, therefore, the sentence that Delegate Karns seeks to strike is only modifying, or only with respect to counties of 200,000 or more? The rest of the counties would fall under section (a) where classification is restricted. Would that not be correct?

VICE-PRESIDENT SMITH: I think your question really calls for a legal interpretation, and that would be my personal interpretation; but I don't think we can categorically say, as a Convention, that that's correct or incorrect.

Delegate Hendren?

MR. HENDREN: I just wanted to say, for the record, that that was the purpose of submitting the amendment, as outlined by Mr. Lewis." (5 Proceedings 3907-08.)

The Karns amendment to delete the last sentence of section 4(b) was adopted (5 Proceedings 3910), but the sentence was subsequently reinstated.

Considering the structure and language of sections 4(a) and (b) of article IX together with the contrasting provisions of section 5 of article IX, and the actions and discussions in the constitutional convention, I am convinced that the sole power of the General Assembly, in the area of classifying real estate for purposes of taxation, is to prescribe limitations upon the power of counties over 200,000 to do so. It seems to me entirely clear that the delegates to the convention included those who opposed any classification of real property for tax purposes, those who favored authorizing the General Assembly to prescribe a permissive classification scheme which any county could adopt, and those who favored classification only in the larger counties, and that the result of much debate and discussion was the adoption of a compromise. That compromise was motivated by a recognition that a new constitution which did not continue the existing *de facto*

classification in Cook County probably would not be adopted by the voters. Since the counties surrounding Cook shared many of its problems and embraced overlapping taxing districts, they, too, should have classification powers, and the authority was finally enlarged to include all counties over 200,000. Efforts to expand beyond that point were repeatedly beaten back, and the original concept that the General Assembly could enact a classification system optional with the counties was eliminated. Recognizing, however, the need for some uniformity in the classification systems which might be adopted by the counties over 200,000, the convention did authorize the General Assembly to prescribe limitations upon their power. I simply cannot, however, agree that the convention intended to empower the General Assembly to establish a mandatory, statewide classification system under which any tract of land 10 acres or more in size and used for agricultural purposes qualifies for favorable tax treatment.

My colleagues, however, have concluded that the legislature possesses the power to classify real estate for purposes of taxation. They reach that conclusion, it seems to me, by a selective process of stressing the sovereign power to tax and ignoring the limitations thereon, emphasizing language referring to proposals which the constitutional convention rejected and characterizing as equivocal what I view as clear expressions of the purpose of that body in adopting the present language of article IX. In so doing the majority has, I fear, permitted its enthusiasm for classification to overcome the fact that our function is to determine what the drafters of our constitution intended, not what we may believe preferable.

In my opinion sections 20a—1 through 20a—3 of the Revenue Act of 1939 are unconstitutional *in toto*.

MR. CHIEF JUSTICE WARD joins in this dissent.