THE NORTHERN TRUST COMPANY, Plaintiff-Appellant and Cross-Appellee, v. E. ALLEN BERNARDI, Director of Labor, Defendant-Appellee and Cross-Appellant.

First District (3rd Division)   No. 84—2139

Opinion filed October 30, 1985.—Modified on denial of rehearing December 30, 1985.

Julie Badel, of McDermott, Will & Emery, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Rosalyn B. Kaplan, Assistant Attorney General, of Chicago, of counsel), for appellee.

PRESIDING JUSTICE WHITE delivered the opinion of the court:

On March 11, 1981, E. Allen Bernardi, the Illinois Director of Labor, issued a notice of determination and assessment demanding that Northern Trust Company pay $1.5 million, in unpaid contributions for the tax period 1977 to 1980, to the Illinois unemployment insurance fund. Following Northern Trust's protests, the Director issued a decision revising the amount due to about $200,000, plus interest. Plaintiff, Northern Trust, filed a complaint under the Administrative Review Act (Ill. Rev. Stat. 1981, ch. 110, par. 264 *et seq.*) against the defendant Director seeking a further revision of the amount due. The trial court affirmed the Director's decision with respect to contributions due, but it reduced the amount of interest due. Northern Trust appeals, arguing that the Director's method of calculating its unemployment contribution rates is contrary to law. In particular, Northern Trust contends that the Director is not allowed to increase his assessments against Northern Trust for 1979, 1980 and 1981 on the basis of his revision of rates for 1978. The Director cross-appeals from the reduction of interest.

Employers' contributions to the Illinois unemployment insurance system are governed by section 1500 *et seq.* of the Unemployment Insurance Act (Ill. Rev. Stat. 1981, ch. 48, par. 570 *et seq.*) (the Act), which states that the employer shall pay each year an amount equal to the employer's wages for insured work paid during the year times the contribution rate for the employer. (Ill. Rev. Stat. 1981, ch. 48, par. 570(B).) For an employer who has incurred liability for payments for at least three years preceding the calendar year for which the rate is being determined, the contribution rate is determined according to the following formula:

$$\frac{\text{benefit wages}}{\text{``wages on which''}} \times \text{experience factor} + \text{emergency rate}$$

(Ill. Rev. Stat. 1981, ch. 48, pars. 573(A), 576.1(B), 576.2.) The benefit wages, experience factor and emergency rate are not in dispute in this proceeding. Section 1503(A) of the Act defines the employer's ratio of benefit wages to "wages on which" as:

"the total of his benefit wages for the 36 consecutive calendar month period ending on the June 30 immediately preceding that calendar year, divided by his total wages for insured work for the same period on which contributions were paid to the Director on or before July 31 immediately following such June 30."

(Ill. Rev. Stat. 1981, ch. 48, par. 573(A).)

The Act provides that wages are counted as "wages on which" for purposes of computing the contribution rate only if contributions were paid on those wages on or before July 31 of the appropriate year. Their inclusion in the equation rewards employers for prompt payment of contributions and punishes those who pay late: wages on which contributions have not been paid on time are not included in the denominator of the benefit-wage ratio, so late payment causes the denominator to decrease, thereby increasing the ratio and correspondingly increasing the contribution rate. Because "wages on which" for a 36-month period are used to calculate the contribution rate for each year, uncorrected underpayment of contributions from one year affects rates for the following three years, whereas late payment affects the contribution rate for only one year if the payment is made within a year of the date on which it was originally due. The dispute in the instant case concerns the effect of a rate revision for 1978 on the amount considered as "wages on which" for purposes of computing Northern Trust's contribution rate for 1979, 1980 and 1981.

In 1978, the Director notified Northern Trust that its contribution rate for 1978 was 2.0%. Northern Trust timely paid 2.0% of its wages for insured work as contributions to the unemployment insurance system. Northern Trust also timely paid contributions at the rates the Director initially assigned for the years 1979, 1980 and 1981. On March 11, 1981, the Director sent Northern Trust notice of revised assessments for the years 1977 through 1980, and the Director required payment of $1,579,928.40 within 31 days. Northern Trust paid nothing and filed a protest on March 30, 1981. On April 7, 1981, the Director sent Northern Trust notice that its contribution rates for 1978 through 1981 were revised. The contribution rate for 1978 was increased from 2.0% to 2.2%, and both parties now agree that that revision was proper. However, that increase accounted for only a small part of the Director's request for $1.5 million. Because Northern Trust protested the assessment of $1.5 million without making any payment after receipt of the notice of increased rates, the Director determined that Northern Trust had not timely paid all contributions due for 1978. The Director held that Northern Trust could therefore count only part of its wages for 1978 as wages on which contributions had been paid. The Director recalculated Northern Trust's contribution rate for 1979, using a reduced figure for Northern Trust's "wages on which" from 1978. If he had not reduced the 1978 "wages on which," Northern Trust would have had contribution rate of 2.9% for 1979; with the director's calculations, the rate was 3.0%. The calculations from which these rates are

derived are set out in the appendix to this opinion. The reduced "wages on which" for 1978 similarly affected contribution rates for 1980 and 1981.

On the basis of the recalculated rate for 1979, the Director found Northern Trust's contributions for 1979 were deficient, so he reduced the amount considered as "wages on which" for 1979, thereby further changing Northern Trust's contribution rates for 1980 and 1981. Similarly, the Director used reduced amounts for the "wages on which" for 1980, thereby increasing Northern Trust's Contribution rate for 1981 still further. If the Director had not reduced the "wages on which," Northern Trust's contribution rates for 1980 and 1981 would have been 2.8% and 2.2% respectively. Under the Director's method of calculation, the contribution rates were 2.9% and 2.5%, respectively. The reduction in "wages on which" for 1979 and 1980 also affects contribution rates for 1981 and 1982, but contributions for years after 1981 are not at issue in this proceeding. Accordingly, the record does not show the effect of the Director's method of calculation upon contributions due for subsequent years.

Under the Director's method of calculation, Northern Trust owes the State $201,849.29, plus interest, for contributions for the years 1978 through 1981. If Northern Trust is given full credit in rate determinations for all wages on which it timely paid contributions at the rate initially determined, Northern Trust owes only $67,457.76. The Director never sent notice demanding this amount, although it appears from the record that, if Northern Trust had paid $67,457.76 within 31 days after the Director demanded $1.5 million, Northern Trust would now owe nothing more. Thus, the Director has essentially assessed a penalty against Northern Trust of $134,391.53 ($201,849.29 minus $67,457.76) for protesting its revised assessment of $1.5 million.

The Director asserts that his method of calculating Northern Trust's contribution rates is supported by the Act, relying on the provision by which the employer is given credit only for "wages for insured work *** on which contributions were paid to the Director on or before July 31 ***." (Ill. Rev. Stat. 1981, ch. 48, par. 573(A).) The Director maintains that this phrase refers to wages on which contributions were timely paid at the correct rate, as eventually determined by the Director, in this case three years after the contributions were due. Northern Trust contends that the phrase refers to wages on which contributions were paid at the contribution rate which the Director initially set.

Our primary objective in statutory construction is to give effect to the intention of the legislature, as expressed in the statute. (*Saskill v. 4-B Acceptance* (1983), 117 Ill. App. 3d 336, 342, 453 N.E.2d 761.) The

Director correctly observes that the statute rewards employers who make timely payments and penalizes those who do not. The statute does not specifically address the Director's power to retroactively revise rates, but our supreme court held that the Director has the power to make retroactive assessments. (*Winakor v. Annunzio* (1951), 409 Ill. 236, 249, 99 N.E.2d 191.) The court has not decided what penalties attach to failure to pay retroactive assessments promptly. Other penalty provisions in the statute clearly apply to all delayed payments. Thus, the Director has the power to file a civil suit to enjoin a delinquent employer from operating a business in this State, even if the delinquency involves only failure to pay retroactive assessments. (Ill. Rev. Stat. 1981, ch. 48, par. 724.) The Act creates a lien in favor of the Director on the real and personal property of an employer who fails to pay amounts due. (Ill. Rev. Stat. 1981, ch. 48, par. 720.) In addition to these penalties, the Act provides that interest accrues on all unpaid assessments at 1% per month; if the unpaid contributions came due after 1981, interest accrues at 2% per month. (Ill. Rev. Stat. 1981, ch. 48, par. 551.) The Director contends that the penalty of higher contribution rates for those who pay late also applies to retroactive assessments.

■ The statute states that employers are to be given credit only for those wages on which contributions were paid "on or before July 31" of the year preceding the year for which the contribution rate is to be calculated. (Ill. Rev. Stat. 1981, ch. 48, par. 573(A).) If the statute refers to wages on which contributions were paid at the correct rate, as eventually determined by the Director, it appears to require Northern Trust to pay by July 31, 1978, at a rate not determined until 1981. The Director interprets the statute to mean that when the Director retroactively revises rates, the employer has 31 days to pay at the revised rates, and the payment will be considered as having been received on the date that the original payment was made in full. However, this interpretation essentially reads into the end of the statute the phrase, "by July 31 *** or within 31 days of the Director's assessment, whichever is later." The Director cites no authority for adding this language to the statute. We cannot read words into a statute unless those words are needed to give effect to the legislature's intent. *Hagen v. City of Rock Island* (1959), 18 Ill. 2d 174, 179, 163 N.E.2d 495.

■ Application of the penalty implicit in section 1503(A) to retroactive assessments effects a much more harsh penalty than does its application to initial assessments. If an employer pays less than the amounts the Director assesses in 1978 for 1978, the employer must

make payments at a higher rate in 1979. If he makes up the deficiency for 1978 in 1979, the underpayment will have no effect on his rates for 1980 and 1981. If the employer never makes up the deficiency for 1978, he will suffer higher rates during 1980 and 1981, but not thereafter. The employer is given notice of the rate he will need to pay for 1979 in 1979, and only if he again fails to pay at the assessed rates will be penalized for underpayment in 1979 in his rate assessments for 1980, 1981 and 1982. There is no spiralling effect of a single underpayment. On the Director's interpretation of the statute as it applies to Northern Trust, there is an immediate spiralling effect of any failure to pay a single retroactive assessment. Because Northern Trust failed to pay an incorrect retroactive assessment of $1.5 million, it was found to have underpaid for 1978. The 1978 underpayment was used to calculate new rates for 1979, 1980 and 1981, and without separate notification or any chance to pay at the revised rate for 1979, Northern Trust was assessed a deficiency for that year which further changed its rates for 1980 and 1981. Again, a deficiency was found for 1980, and deficiences for 1978, 1979 and 1980 were used to increase Northern Trust's rate for 1981. On the Director's interpretation of the Act, this spiralling effect is not limited. The legislature has nowhere clearly expressed an intention to impose this cumulative penalty on those who fail to pay retroactive assessments, while it imposes a lesser penalty on those who fail to pay initial assessments. We will not read such a disproportionate and severe penalty into the statute. The legislature must clearly express its intention to impose such a penalty since penal statutes are strictly construed. *Cook County v. Thomas Recreational Vehicle* (1979), 68 Ill. App. 3d 582, 584, 386 N.E.2d 591.

Furthermore, the Director's assessment of this penalty against Northern Trust depends upon a fictitious account of Northern Trust's payments. The Director initially notified Northern Trust that its contribution rate for 1978 was 2.0%. Northern Trust multiplied its total wages for insured work for the second quarter of 1978 by 2.0%, and it contributed that amount, thereby assuring that its "wages on which" would include all wages for insured work for that quarter. The Director subsequently revised the rate to 2.2%, and finding a deficiency, he treated Northern Trust as though it had initially used a falsely low figure as wages for insured work, and multiplied that by 2.2% to determine its contributions for 1978. But in fact Northern Trust never used a falsely low figure for its wages for insured work. Northern Trust used both its total wages for insured work, and the rate assessed by the Director, in determining its contributions, and it should accordingly

be given credit for all of its wages for insured work as "wages on which."

▪ Therefore, we reject the Director's interpretation of the Act; we hold that the provision in section 1503(A) of the Act according to which an employer's benefit wage ratio reflects wages "on which contributions were paid to the Director on or before July 31" refers to contributions paid at the rate determined by the Director before the June 30 preceding the July 31 due date for payments. In the instant case, it refers to contributions paid at the rate initially set by the Director. The Director incorrectly applied to late payment of retroactive assessments the penalty for late payments of current assessments implicit in section 1503(A). We reverse the trial court order affirming the Director's assessment of Northern Trust for a deficiency of $201,849.29.

Northern Trust admits that it is liable for a deficiency of $67,457.76. The trial court assessed interest on the deficiency from the date of the Director's final decision, March 25, 1983. Northern Trust appeals, arguing that the Director is estopped from assessing any interest. The Director cross-appeals, contending that Northern Trust is liable for interest on the portions of the deficiency from the dates on which payments would have been due if the Director had initially made the correct assessments. Thus, the Director charged interest from 1978 on part of this revised assessment, although the Director did not notify Northern Trust of the revised assessment until 1981.

The Director relies on section 1401 of the Act, which states:

"Any employer who shall fail to pay any contributions when required of him by the provisions of this Act *** whether or not the amount thereof has been determined and assessed by the Director, shall pay to the Director, in addition to such contribution, interest thereon at the rate of one per cent (1%) per month *** computed from the day upon which said contribution became due. After 1981, such interest shall accrue at the rate of 2% per month *** upon any unpaid contributions which become due.

However, all or part of any interest may be waived by the Director for good cause shown." (Ill. Rev. Stat. 1981, ch. 48, par. 551.)

Northern Trust argues that the assessment did not "become due" until March 25, 1983, the date of the Director's final decision on Northern Trust's protest. The Director contends that the contributions which were assessed in 1981 were "required of [Northern Trust] by the provisions of this Act" in the various quarters, starting in 1978, for which the revised assessments were made. We agree with the Director.

■ By the inclusion of the phrase "whether or not the amount thereof has been determined and assessed by the Director," the legislature clarified its intention to allow interest from the date that the payment should have been made for the quarter at issue, without binding the Director by any notices he has sent or failed to send. Northern Trust is not penalized by this provision; it is simply required to reimburse the Fund for the use of the money which it, rather than the Fund, has enjoyed since 1978 solely due to an error in the calculation of its rate. (*People v. Baldwin* (1919), 287 Ill. 87, 91, 122 N.E. 148.) Not all assessments of interest are penalties. (*Hoffman v. Clark* (1977), 69 Ill. 2d 402, 429, 372 N.E.2d 74.) The legislature clearly separated the interest section of the Act (par. 551) from the penalties (par. 552), indicating that interest may be imposed in circumstances in which penalties would be improper.

■ Northern Trust argues that under the circumstances of this case the Director should be estopped from assessing interest. Courts of this State have long been reluctant to invoke estoppel against the State functioning in a governmental capacity. As the court recently stated in *National Service Lines, Inc. v. Edgar* (1985), 129 Ill. App. 3d 729, 731, 473 N.E.2d 134:

"Only in extraordinary circumstances may estoppel be invoked against the State in its collection of the public revenue. [Citations.] Estoppel cannot be invoked merely because the State sends out a notice of tax liability, accepts payment pursuant to the amount stated in the notice and then seeks to reexamine the taxpayer's records to determine if additional liability exists. [Citations.]"

Northern Trust argues that the instant case presents extraordinary circumstances, citing two California cases and *C. O. Baptista Films v. Cummins* (1956), 9 Ill. 2d 259, 137 N.E.2d 393. In *Baptista Films*, our supreme court upheld the Director of Labor's assessment against an employer, even though the Director had granted the employer an exemption based on a decision of the circuit court, where the Director based his revised evaluation of the employer's exemption on a subsequent decision of the Illinois Supreme Court. However, the court reversed the Director's assessment of interest and penalties. (9 Ill. 2d 259, 266.) The court did not treat interest and penalties separately, and it did not distinguish its previous decision in *Todd v. Annunzio* (1951), 410 Ill. 343, 102 N.E.2d 297. In *Todd*, the court upheld the Director's assessment of contributions and interest against an employer for a five-year period, despite the fact that the employer had previously received no notice of his liability. (410 Ill. 343, 348.) We believe

that these decisions can be reconciled by the fact that the liability in *Baptista Films* was based on an intervening change of law. During the tax years involved in *Baptista Films*, but in a different case, our supreme court gave a definitive interpretation of the Unemployment Compensation Act; the interpretation was directly opposed to an earlier circuit court decision which had overturned the Director's assessment against Baptista Films. On the basis of the supreme court decision, the Director reinstated his original assessment. For the period prior to the reinstatement of the assessment the supreme court did not think it just to allow penalty and interest, but for the period after that date, both were allowed. (9 Ill. 2d 259, 266.) There was no intervening change of law in the instant case, so we find that the Director is not estopped from assessing interest under section 1401 of the Act. Ill. Rev. Stat. 1981, ch. 48, par. 551.

The Director assessed interest at the statutory rate of 1% per month from one month after the end of each quarter for which deficiencies were found, until 1982. Starting with January 1982, he assessed interest at the rate of 2% per month. The statute states that "[a]fter 1981, such interest shall accrue at the rate of 2% per month *** upon any unpaid contributions which become due." (Ill. Rev. Stat. 1981, ch. 48, par. 551.) We believe this provision allows interest at 2% per month only on amounts which become due after 1981. The amounts at issue in this proceeding all became due from 1978 to 1981. Therefore, all interest should be assessed at the statutory rate of 1% per month. We remand this matter for further proceedings in accordance with this opinion.

Reversed and remanded.

McGILLICUDDY and RIZZI, JJ., concur.

### APPENDIX

The basic equation for determining contributions is:

taxable wages × contribution rate = contributions owed.

If contributions owed = contributions paid (*i.e.*, if contributions are paid in full by July 31), then the employer is given credit for all of his taxable wages as "wages on which," so taxable wages = "wages on which." In general, the credit for "wages on which" can be determined by using the equation:

"wages on which" × contribution rate = contributions paid,

which is equivalent to:

contributions paid ÷ contribution rate = "wages on which."[1]

In the second quarter of 1978, Northern Trust had taxable wages of $5,698,586.47; it made contributions of $114,251.61, approximately 2% of its taxable wages, as required by the Director's initial assessment. In 1981, the Director found that the rate should have been 2.2%, and thus contributions should have been $125,368.90 ($5,698,586.47 × 2.2%). When Northern Trust failed to pay the entire assessment of $1.5 million, the Director determined Northern Trust's "wages on which," using a method that is equivalent to use of the above equation. Northern Trust's actual contributions were $114,251.61, and at a 2.2% rate, the equation gives the "wages on which" as:

$114,251.61 ÷ 2.2% = $5,193,255.00.[2]

Thus, the Director reduced the "wages on which" for the second quarter of 1978 by $505,331.47 ($5,698,586.47 minus $5,193,255.00).

The Director next recalculated the 1979 contribution rate for Northern Trust. He had initially determined that Northern Trust's total "wages on which" for the 36 months ending in June 1978 were $44,020,260.26; after he reduced the "wages on which" for the second quarter of 1978, he reduced the 36 months' "wages on which" to $43,514,928.79 ($44,020,260.26 minus $505,331.47). Northern Trust had benefit wages of $925,040.62 for the 36-month period ending June 30, 1978; the State experience factor was 126, and the emergency contribution rate was 0.3%. Thus, if the Director gave Northern Trust full credit for all wages on which it paid contributions at the rate initially assigned, its contribution rate for 1979 would be given by the formula on page 2 of the opinion:

($925,040.62 ÷ $44,020,260.26) × 126 + 0.3 = 2.948%

which, according to the Act must be rounded to 2.9% (Ill. Rev. Stat. 1977, ch. 48, par. 576.1(C)). Under the Director's method, giving only partial credit for "wages on which," the rate is:

($925,040.62 ÷ $43,514,928.79) × 126 + 0.3 = 2.979%

which is rounded to 3.0%. The Director then applied the equation for "wages on which" again to determine a reduced "wages on which" for 1979, dividing Northern Trust's contribution by 3.0%, and he used this reduced "wages on which" for 1979, along with a reduced "wages on which" for 1978, to determine Northern Trust's contribution rate for 1980. He determined the contribution rate for 1981 similarly.

---

[1]The equations are equivalent because the statutory contribution rate is never equal to zero. Ill. Rev. Stat. 1981, ch. 48, par. 576.1.

[2]The Director found the "wages on which" to be $5,193,121.80, because he used a method which introduced a rounding error of $133.20. The error does not materially affect the calculation of Northern Trust's contribution rate for subsequent years.