THE PEOPLE *ex rel.* JOSEPH V. BONEFESTE, County Treasurer and *ex officio* County Collector of Taxes for Sangamon County, Illinois, Applicant-Appellee, v. B.D.H. RENTALS *et al.*, Objectors-Appellants (Springfield School District 186, Intervenor-Appellee; B.D.H. Rentals *et al.*, Objectors-Appellants; Basco, Inc., *et al.*, Objectors-Appellants; Samuel Altman *et al.*, Objectors-Appellants).

Fourth District   No. 4—95—0264

Argued October 24, 1995.—Opinion filed January 19, 1996.

Donald J. Casper (argued), of Springfield, and William J. Conroy, Jr. (argued), of Cantrall, for appellants.

Denise M. Druhot (argued) and Eric L. Grenzebach (argued), both of Brown, Hay & Stephens, and Robert T. Lawley, of Routman & Lawley, Ltd., both of Springfield, for appellee Springfield School District 186.

JUSTICE KNECHT delivered the opinion of the court:

Appellants, a group of tax objectors (objectors) in Sangamon County, appeal the trial court's grant of summary judgment for applicants, the treasurer for Sangamon County and intervenor Springfield School District No. 186 (District). We affirm.

In 1990, 1991, 1992, and 1993, objectors paid their real estate taxes levied on behalf of the District under protest and filed objections with the circuit court. The objections remained pending until January 1994, when the District intervened. Both parties filed cross-motions for summary judgment. The trial court granted summary

judgment for the District on all issues. Objectors appeal. The facts relevant to each issue will be provided during the discussion.

## I. LEGAL VALIDITY OF BOARD OF REVIEW ACTION TAKEN IN NONAUTHORIZED EXTENDED SESSION

■ Objectors first assert the multipliers applied to their property assessments for the years 1990 and 1992 were invalid because the County Board of Sangamon County (County Board) was not in valid session at the time it adopted these final multipliers. Section 107 of the Revenue Act of 1939 (Act) (Ill. Rev. Stat. 1989, ch. 120, par. 588) declares a board of review shall adjourn not later than December 31, unless the county board authorizes it to remain in session beyond that date. Here, objectors contend "In 1990, the [Board of Review of Sangamon County (Board)] adjourned on or before December 31, 1990, without a Resolution but ultimately did pass a Resolution on February 4, 1991[,] extending the adjournment date"; and in 1992, the Board adjourned officially on February 8, 1993, without the County Board having passed a resolution authorizing an extended adjournment date. Objectors argue the Board's increases in assessments for these years, made during unauthorized extended sessions, were without legal effect.

This argument is without merit. In *People ex rel. Ball v. Anderson* (1961), 21 Ill. 2d 396, 172 N.E.2d 760, the supreme court rejected the argument of a group of tax objectors who argued the actions by a county board of review were invalid because it had remained in session beyond the statutorily authorized time limit. The court upheld the action of the board of review on two grounds: (1) the County Board approved of the additional time by its actions and additional extensions of time were obtained from the Department of Revenue; and (2) the adjournment dates for a board of review are *directory only*. Actions by a board of review after the statutory adjournment date are still the valid acts of a legally constituted and functioning board. (*Anderson*, 21 Ill. 2d at 401-02, 172 N.E.2d at 763.) The 1990 and 1992 assessments were legal as they were adopted by a validly constituted board of review.

## II. NOTICE OF PROPERTY ASSESSMENT MULTIPLIER

■ Objectors next argue the notice regarding the multiplier for both 1990 and 1992 was deficient. In 1991, the Board on April 26 published notice of a proposed multiplier of 1.042, which would apply to the 1990 tax assessment of all nonfarm property in Capital Township and set a public hearing on the proposed multiplier on May 1. The hearing occurred and the Board adjourned that same day. On May 17, the Board received the final multiplier from the Illinois

Department of Revenue (Department) which was equal to the proposed multiplier. Notice of the final assessment was mailed to taxpayers on or about May 17.

On November 30, 1992, the Board published notice in a newspaper of a proposed multiplier of 1.0399, which would apply to the 1992 tax assessment of all nonfarm property in Capital Township with a hearing scheduled for December 8. The hearing occurred and the Board adjourned on February 8, 1993. On February 26, the Board received the final multiplier from the Department which was equal to the proposed multiplier. Notice of the final assessment was mailed to taxpayers on February 27.

Objectors argue the notices of the increases in assessments for 1990 and 1992 were deficient because notice of the multipliers was by publication in a newspaper rather than personal notice. The Act has different notice requirements depending on whether the assessment will be increased for an *individual* taxpayer or a *class* of taxpayers. During the years in question, section 107 of the Act authorized a board of review to "revise the entire assessment of any *taxpayer*" (emphasis added) (Ill. Rev. Stat. 1989, ch. 120, par. 588) after giving the taxpayer individual notice and an opportunity to be heard. Similarly, section 108(4) of the Act allowed a board of review to "adjust the assessment of any *individual* or *corporation*" (emphasis added) (Ill. Rev. Stat. 1989, ch. 120, par. 589(4)) after giving that person or corporation individual notice and an opportunity to be heard. However, subsection (5) of section 108 declared the board of review may "[i]ncrease or reduce the *entire* assessment of real property, or of any *class* included therein" (emphasis added) after it has published notice of the change "in a newspaper of general circulation published in the county," and "given the owners of the property affected *** an opportunity to be heard within 20 days after the date of such publication." (Ill. Rev. Stat. 1989, ch. 120, par. 589(5).) Section 108(5) of the Act declared notice by publication sufficient when an increase in assessment will apply to an entire *class* of taxpayers. Individual notice is not required. Here, the proposed increase was to apply to all nonfarm property, an entire *class* of taxpayers, and the notice by publication was sufficient.

■ Objectors also argue the language of section 108(5) of the Act requires the Board to provide a 20-day period between notice of the hearing and the hearing, citing *People ex rel. Lovelace v. Heldebrandt* (1984), 128 Ill. App. 3d 359, 470 N.E.2d 1109. *Heldebrandt* misconstrued the plain language of section 108(5) of the Act, which required a board of review to promptly allow a class of taxpayers a hearing *within* 20 days of the notice of the increased assessment. Twenty

days is the *uppermost* time limit a board of review may allow to transpire between giving notice of and conducting a hearing. Here, in both instances in question, the Board provided public hearings *within* 20 days of the notice of each hearing and complied with the notice requirement in section 108(5) of the Act.

■ To be valid, notice of a proposed multiplier must be received before the final multiplier is adopted and while the board of review is still in session so taxpayers have an opportunity to be heard before such board. (*People ex rel. Haas v. Ackermann* (1982), 110 Ill. App. 3d 789, 442 N.E.2d 1388.) Objectors contend the final notices they received are invalid because the notices came after the adoption of the multiplier and after the Board had adjourned. However, they received notices *before* the hearings on the increases and *before* the Board had adjourned in both instances. The final notices to which objectors refer merely informed them the proposed multipliers had been formally adopted. Objectors received notices of the multipliers and were given an opportunity to be heard regarding the multipliers. They received due process in both instances.

■ Finally, objectors argue the notice for the 1990 multiplier was deficient because it contained erroneous information. A proposed assessment change is deficient if it does not contain sufficient and accurate information to provide actual notice of the proposal to the taxpayer. (*In re Application of Clark County Collector* (1983), 116 Ill. App. 3d 539, 452 N.E.2d 100 (notice deficient where specific changes in assessments not listed); *In re Application of McHenry County Collector* (1980), 91 Ill. App. 3d 49, 414 N.E.2d 229 (notice deficient where final multiplier higher than proposed multiplier and stated duration of multiplier incorrect).) Here, objectors point out the notice mailed after April 30, 1991, listed two avenues of appeal: the appeals board and the Board. Objectors argue this confusion made the notice deficient. However, the notice in question was simply the notice of the final adopted multiplier—mailed *after* notice of and the hearing on the proposed increase. Proper notice was received regarding the increase.

### III. TAX CLASSIFICATION OF NONFARM PROPERTY

■ Objectors next assert because the multipliers for 1990, 1991, 1992, and 1993 applied only to nonfarm property, the multipliers constituted an illegal classification of real property in violation of the Illinois Constitution. Article IX, section 4, of the Illinois Constitution declares "taxes upon real property shall be levied uniformly by valuation ascertained as the General Assembly shall provide by law." (Ill. Const. 1970, art. IX, § 4.) The General Assembly has declared in sec-

tion 20e of the Act "[t]he equalized assessed value of each tract of real property constituting a 'farm' *** shall be determined pursuant to this Section." (Ill. Rev. Stat. 1989, ch. 120, par. 501e (see 35 ILCS 205/20e (West 1992)), repealed by Pub. Act 88—455, § 32—20, eff. January 1, 1994 (1993 Laws 3497, 3830).) Section 4(b) of article IX also allows counties with a population of 200,000 or more inhabitants to classify real property for tax purposes, subject to such limitations as the General Assembly provides by law. (Ill. Const. 1970, art. IX, § 4(b).) The General Assembly has enacted such limitations, among which is section 20a of the Act, which declares when a county classifies property for tax purposes pursuant to article IX, section 4, of the Illinois Constitution it must establish such classification by ordinance or the classification is void. Ill. Rev. Stat. 1989, ch. 120, par. 501a.

Objectors assert the County Board was without authority to classify property in Sangamon County into farm and nonfarm property. Objectors further assert even if it had such authority, it did not enact an ordinance creating such classification, thereby rendering such classification and taxes void. These arguments are without merit. In *Hoffmann v. Clark* (1977), 69 Ill. 2d 402, 372 N.E.2d 74, the supreme court declared the General Assembly has the power to classify real estate in counties under 200,000 in population. Article IX, section 4, of the Illinois Constitution requires only that if the General Assembly authorizes classification of property, then taxes must be uniform within each class. (See also *People ex rel. Bosworth v. Lowen* (1984), 102 Ill. 2d 242, 248, 464 N.E.2d 1053, 1056.) The parties do not dispute Sangamon County's population is under 200,000. Through the Act, the Illinois General Assembly, *not* the County Board, has classified real property within Sangamon County as farm or nonfarm property. The County Board was following the directives of the General Assembly as mandated in the Act, not classifying property under its own authority. The County Board did not violate the Illinois Constitution, nor was it required to enact an ordinance as a prerequisite to assessing farm and nonfarm property differently.

■ Objectors also argue the increase in the assessment of urban property, made while the assessment on farm property was not increased, was arbitrary and unreasonable, rendering it invalid as violative of equal protection. In *In re Application of Johnson* (1986), 141 Ill. App. 3d 492, 491 N.E.2d 1174, the appellate court declared a county assessor violated the equal protection rights of farm property owners when he increased the assessment of farm properties by 12%, and earlier than was scheduled, while at the same time delayed reassessing urban property, and then increased the assessment of urban property by a much smaller amount. (*Johnson*, 141 Ill. App. 3d at

497-98, 491 N.E.2d at 1178.) *Johnson* is distinguishable. Objectors have not shown or asserted the assessor of Sangamon County assessed nonfarm property before farm property. Objectors have not shown the assessor of Sangamon County increased the assessment of nonfarm property substantially more than the assessment of farm property. Objectors have failed to establish a violation of their equal protection rights in this regard.

## IV. TAX LEVIES FOR FIRE PREVENTION AND SAFETY PURPOSES

Objectors next argue the District's levy contravened the requirements of sections 17—2.11 and 17—2.11a of the School Code (Code) (Ill. Rev. Stat. 1989, ch. 122, pars. 17—2.11, 17—2.11a). In 1981, section 17—2.11 declared when a school district determines school facilities need upgrading for conservation or safety purposes, the school district may levy a tax for such purposes "not to exceed .05% per year" by resolution, or 0.10% by referendum, but that such tax was "*subject to the provisions contained in Section 17—2.11a.*" (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 122, par. 17—2.11.) Section 17—2.11a declared each school district which has levied a tax pursuant to section 17—2.11 may borrow money and issue bonds for such purposes without referendum, stating:

"In order to authorize and issue such bonds the school board shall *** provide for the levy and collection of a direct annual tax upon all the taxable property in the school district sufficient to pay the principal and interest on such bonds to maturity. *** [I]t is the duty of the county clerk to extend the tax therefor *in addition to and in excess of all other taxes* heretofore or hereafter authorized to be levied by such school district.

After the time such bonds are issued as provided for by this Section it is the duty of the county clerk in computing the amount to be extended pursuant to the tax specified in Section 17—2.11 of any such district to reduce the amount of the taxes to be so extended by the amount levied to pay the principal of and interest on the bonds authorized by this Section.

If the amount of tax to be extended by the county clerk in any year pursuant to Section 17—2.11, and before any abatement pursuant to this Section, is less than the amount levied in that year to pay the principal of and interest on the bonds issued pursuant to this Section then the amount of such deficiency shall be added to the amount to be abated during the succeeding year." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 122, par. 17—2.11a.)

The bonds referred to in then section 17—2.11a of the Code have been authorized since 1972 (Pub. Act 77—2742, approved August 29,

1972 (1972 Ill. Laws 1960) (amending Ill. Rev. Stat. 1971, ch. 122, pars. 17—2.11, 17—2.11a)), and its provisions recently repealed (Pub. Act 87—984, § 3, eff. January 1, 1993 (1992 Ill. Laws 2019, 2044)), have been incorporated into section 17—2.11 of the Code (105 ILCS 5/17—2.11 (West 1994)). At all relevant times, these sections have expressly permitted a school district to issue bonds, in addition to levying a 0.05% tax, in any amount necessary to complete the necessary improvements.

■ The primary rule of statutory construction is to ascertain and give effect to the true intent of the legislature. In determining the legislative intent, a court should first consider the statutory language. Where the statutory language is clear, it will be given effect without resort to other aids for construction. *People ex rel. Baker v. Cowlin* (1992), 154 Ill. 2d 193, 197, 607 N.E.2d 1251, 1253.

■ Objectors argue the plain meaning of section 17—2.11 of the Code is the maximum tax a school district may levy for fire prevention and safety is 0.05% without a referendum and 0.10% with a referendum. They assert section 17—2.11a of the Code requires the section 17—2.11 tax must be reduced by the amount of bonds issued pursuant to section 17—2.11a, so the total revenues from sections 17—2.11 and 17—2.11a are no more than 0.05% (or 0.10% by referendum). We disagree. The language in these sections is plain and unambiguous. The tax levy under section 17—2.11a is separate and *in addition to* the tax levy under section 17—2.11. Section 17—2.11, however, is subject to section 17—2.11a. The tax levy in section 17—2.11 must be reduced (abated) to the extent of the tax levied under section 17—2.11a. If the reduction in the section 17—2.11 tax results in a negative number, then that negative amount is carried over to the next year's reduction (abatement) of the section 17—2.11 tax in that year. The practical effect of these two sections is to allow a school district either to levy a constant tax of up to 0.05% (or 0.10% by referendum) per year under section 17—2.11, or to compress multiple years of this tax rate into a higher rate for fewer years pursuant to section 17—2.11a. If a school district chooses this latter option, then the district cannot levy the section 17—2.11 tax again until such time as the section 17—2.11a taxes, if they had been spread out over multiple years at the lesser section 17—2.11 rate, would have equaled the section 17—2.11a taxes received to date. A school district may issue bonds and pay for that debt by a tax levy under section 17—2.11a up to the amount necessary to pay the cost of needed school improvements, so long as the school district does not *exceed* the overall debt ceiling placed on school districts. (See 105 ILCS 5/19—1 (West 1994).) Objectors do not argue the District

exceeded the maximum debt limit of a school district in issuing bonds for fire prevention and safety purposes.

Moreover, were we to assume sections 17—2.11 and 17—2.11a were ambiguous on the maximum tax rate allowable for fire prevention, safety, energy conservation and school security purposes, public policy would weigh against objectors' proposed interpretation. A strict limitation of either 0.05% (or 0.10% by referendum) on the tax a school district may levy for safety purposes would jeopardize the safety of school children. In construing the statute, we must assume the legislature did not intend to produce such an absurd result. (*State Farm Fire & Casualty Co. v. Yapejian* (1992), 152 Ill. 2d 533, 541, 605 N.E.2d 539, 542.) The District did not violate sections 17—2.11 and 17—2.11a of the Code by levying a total tax in excess of 0.05% for these purposes.

■ Objectors next argue the section 17—2.11a requirement that "[e]ach school district *which has levied a tax* in the amount and for the *** purposes specified in Section 17—2.11" (emphasis added) (Ill. Rev. Stat. 1989, ch. 122, par. 17—2.11a) may borrow money and issue bonds requires the District to levy a section 17—2.11 tax *each* year in which the District wishes to borrow money and issue bonds under section 17—2.11a. Once again, the language of the statute is plain. There is no limitation in the Code that a section 17—2.11 tax is valid for only one year and must be levied again each subsequent year. We find no authority for interpreting the section in this way. To the contrary, the clear language of section 17—2.11 declares a tax levy thereunder may continue its validity for a number of years: a school district may levy the 0.05% tax "*for a period* sufficient to finance such alterations or reconstruction[s]." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 122, par. 17—2.11.) The District levied the section 17—2.11 tax in 1982 and did not repeal the tax in any year thereafter. Therefore, the section 17—2.11 tax remained in effect, and the District could issue bonds for enumerated purposes in that year or any year thereafter pursuant to section 17—2.11a.

## V. TAX LEVIES FOR THE DISTRICT'S RETIREMENT FUND

■ Objectors next contend the District did not comply with the Illinois Pension Code (Pension Code) (Ill. Rev. Stat. 1989, ch. 108$1/2$, par. 1—101 *et seq.* (now 40 ILCS 5/1—101 *et seq.* (West 1994))) when it levied taxes to support its pension fund, and therefore those taxes were void. Section 7—171(a) of the Pension Code states each municipality "shall appropriate" the appropriate funds for pension contributions. (Ill. Rev. Stat. 1989, ch. 108$1/2$, par. 7—171(a) (now 40 ILCS 5/7—171(a) (West 1994)).) Objectors do not object to the amount

appropriated by the District, but contend it failed to properly "appropriate" according to the Pension Code. Section 8—2—9 of the Illinois Municipal Code (Municipal Code) (Ill. Rev. Stat. 1989, ch. 24, par. 8—2—9 (now 65 ILCS 5/8—2—9 (West 1994))) declares in municipalities with less than 500,000 inhabitants, the corporate authorities shall pass an annual appropriation ordinance which includes the amounts and purposes of moneys appropriated, including for pension funds. In addition, section 3 of the Illinois Municipal Budget Law (Budget Law) declares each municipality shall "adopt a combined annual budget and appropriation ordinance" listing amounts of money appropriated and their purposes. (Ill. Rev. Stat. 1989, ch. 85, par. 803 (now 50 ILCS 330/3 (West 1994)).) Objectors argue these sections required the District to pass an ordinance appropriating sums for the municipal retirement fund, which it did not do. However, the plain language of section 2(1) of the Budget Law excepts school districts from its coverage: " 'Municipality' means and includes all municipal corporations and political subdivisions of this State *** except the following: *** (f) school districts." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 85, par. 802(1) (now 50 ILCS 330/2(1) (West 1994)).

Objectors argue notwithstanding this exception, we should look to the Municipal Code and by way of analogy apply its provision requiring an appropriation ordinance to the Pension Code. This argument is without merit. First, to require school districts to adopt an appropriation ordinance would directly conflict with the intent of the legislature to except school districts from such a requirement in the Budget Law. Second, "appropriate" is defined in relevant part as: "To prescribe a particular use for particular moneys; to designate or destine a fund or property for a distinct use, or for the payment of a particular demand." (Black's Law Dictionary 101 (6th ed. 1990).) "Appropriation" is defined in relevant part as:

"The act by which the legislative department of government designates a particular fund, or sets apart a specified portion of the public revenue or of the money in the public treasury, to be applied to some general object of governmental expenditure, or to some individual purchase or expense." (Black's Law Dictionary 102 (6th ed. 1990).)

As these definitions show, budget allocations adopted by a legislative entity are "appropriations." When the District, in its yearly budgets, set aside money for its pension fund, it "appropriated" that money in compliance with section 7—171(a) of the Pension Code.

This interpretation comports with the Code. Section 17—1 of the Code sets out the procedural requirements for a school district's

adoption of an annual budget; the public must be given notice of the proposed budget, and then the local board may adopt the final budget after a public hearing. (Ill. Rev. Stat. 1989, ch. 122, par. 17—1 (now 105 ILCS 5/17—1 (West 1994).) Formal adoption constitutes the official legislation authorizing expenditures as laid out in the proposed budget. The Code does not require a separate ordinance be passed as a condition to adopting a budget. The District properly appropriated pension funds pursuant to section 7—171(a) of the Pension Code. The taxes levied to support those appropriations were proper.

## VI. TAX LEVIES FOR THE DISTRICT'S WORKING CASH FUND

■ Objectors next argue the $13 million of working cash fund bonds in 1982 were not valid obligations when issued—based on a mathematical computation of formula the District was entitled to use—so they cannot be required to pay taxes for repayment of these bonds, i.e., an extension of a levy and collection of taxes in 1993. Section 20—2 of the Code allowed a school district to create a working cash fund, and issue bonds in evidence thereof, in an amount "not exceeding in the aggregate 75% of the taxes permitted to be levied for educational purposes for the then current year." (Ill. Rev. Stat. 1981, ch. 122, par. 20—2 (now, as amended, 105 ILCS 5/20—2 (West 1994) (not exceeding in aggregate 85%)).) Section 20—3 of the Code allowed a school district to levy "not to exceed .05% of value, as equalized or assessed by the Department of Revenue," to support a working cash fund, provided no such tax shall be levied if the amount of the tax "will increase the working cash fund to a total amount exceeding 75% of the taxes last extended for educational purposes of the district." Ill. Rev. Stat. 1981, ch. 122, par. 20—3 (now, as amended, 105 ILCS 5/20—3 (West 1994) (85%)).

In July 1982, the District levied a 0.05% working cash fund tax pursuant to section 20—3 of the Code. In September 1982, the District issued $13,088,340.65 worth of bonds to supply its working cash fund. The property taxes levied to fund these bonds were slightly more than 0.30%. These taxes alone amounted to 75% of total educational taxes. Thus, when these taxes were added to the 0.05% tax already levied, the District's working cash fund taxes exceeded the 75% maximum of total educational taxes allowable pursuant to section 20—2 of the Code. Sometime in 1982 or 1983, the District conceded it had exceeded the 75% maximum under section 20—2 of the Code. Instead of directly refunding any excess taxes to objectors, the District accomplished a tax refund by abating its working cash fund tax levy for 1983 in an amount equal to the 0.05% tax in 1982 plus

interest, thereby resulting in a working cash fund tax in 1983 of *less* than the 75% maximum tax levy otherwise allowable. Objectors assert the District's bond issuance in excess of the statutory maximum rendered invalid the *entirety* of the $13 million in bonds, and objectors are entitled to a refund of *all* taxes used to repay the illegally issued bonds. This argument is without merit.

Defendants do not cite any authority for declaring void the totality of a tax when only a portion of the tax exceeds a statutory limit. To the contrary, courts have indicated it is only the *excess* portion of a tax that is declared void. For example, in *In re Application of the Du Page County Collector* (1993), 243 Ill. App. 3d 823, 612 N.E.2d 866, the appellate court affirmed the trial court's declaration a county tax was illegal and void *to the extent that tax exceeded the statutory maximum*. The 1982 taxes were in excess only by the amount of the 0.05% tax, which the District repaid, with interest, by abating its 1983 tax levy. The remainder of the 1982 taxes fell within the 75% limit and were not void.

## VII. AMENDMENT OF PLEADINGS AFTER JUDGMENT

Objectors finally assert the trial court erred in failing to allow them to amend their pleadings after judgment to conform to the proofs. Objectors concede, however, we need reach this issue only if we rule in their favor. Because we have affirmed the trial court's grant of summary judgment against objectors, we need not reach this issue.

## VIII. CONCLUSION

Although tax statutes are to be strictly construed in favor of the taxpayer (*Van's Material Co. v. Department of Revenue* (1989), 131 Ill. 2d 196, 202, 545 N.E.2d 695, 698), each of objectors' arguments is without merit. The trial court's grant of summary judgment for the District is affirmed.

Affirmed.

COOK, P.J., and GREEN, J., concur.